## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re | **Case No. 3:15-CV-117-SMR-HCA** |
| **GRETTER AUTOLAND, INC,** | **Chapter 7** |
| **Debtor** | |

## APPELLANT JAMES GRETTER'S RESPONSE
## TO GENERAL MOTORS, LLC AND EDWARDS AUTO PLAZA, INC.'S
## MOTIONS TO DISMISS APPEAL

JAMES M. GRETTER
1200 Main St., Ste. 2200
Kansas City, Missouri 64105
Telephone:  (816) 472-7474
Facsimile:  (816) 472-6262
Email:  jgretter@fwpclaw.com
*PRO SE* **APPELLANT/CREDITOR**

I.      **INTRODUCTION**

Appellant's appeal is not moot, constitutionally or otherwise, because of subsequent events that occurred following the bankruptcy's court's August 17, 2015 Order, which is the subject of this appeal.   However, should the Court grant General Motors, LLC ("GM") and Edwards Auto Plaza, Inc.'s ("Edwards") Motions to Dismiss Appeal, the Court should vacate the bankruptcy court's August 17th Order and remand with direction that the bankruptcy court to dismiss Debtor's Motions to Assume and Assign its GM and Ford Dealer Agreements.

A.      **APPELLANT'S APPEAL IS NOT MOOT**

Appellant contends in this appeal that the bankruptcy court, in denying Debtor's Motions to Assume Assign its GM and Ford Franchise Agreements, committed multiple errors of law and fact, including (1) disregarding the laws of the State of Iowa and abrogating Debtor's property interest in its GM and Ford Franchise Agreements for no discernible reason when it found that Debtor was in default of provisions in its Franchise Agreements that are void under Iowa law; (2) finding that Debtor was in default of an agreement that was not offered into evidence; and (3) finding that Debtor was attempting to assume and assign its 2008 GM Franchise Agreement, which terminated in 2010 by its own terms, when Debtor's Motions to Assume and Assign and Debtor's representations to the bankruptcy court made it abundantly clear that Debtor was moving for the assumption and assignment of its 2010 GM Franchise Agreement.   For these and the other reasons discussed in Appellant's Brief, the Court should reverse the bankruptcy court's ruling.

Appellant's appeal is not moot because reversing the bankruptcy court's August 17th Order will provide effective relief.   Edwards's assertion, at this juncture in this matter, that it will not proceed with closing on the sale of Debtor's assets pursuant to the Asset Purchase

1

Agreement ("APA") it entered into with Debtor is of no significance with respect to the question of whether this appeal presents a live "case or controversy."

Neither is this matter "equitably moot" since the bankruptcy court did not grant affirmative relief, and this Court's reversal of the bankruptcy court's order would not be detrimental to a party who changed its position in reliance on the bankruptcy court's order, as may be the case when a bankruptcy case approves of a reorganization plan and reversal would jeopardize the success of the reorganization, or when the bankruptcy court approves the sale of an asset and a third party pays for the asset relying on the bankruptcy court's approval.  Last, the conversion of this matter from Chapter 11 to Chapter 7 does not render this appeal moot since the bankruptcy court could, on remand, convert the matter back to Chapter 11 or substitute the Chapter 7 Trustee for Debtor on Debtor's Motions to Assume and Assign.

**B.     ALTERNATIVELY, THE PROPER DISPOSITION OF THIS MATTER IS VACATUR AND REMAND**

Should the Court find in favor of GM and Edwards and hold this appeal is constitutionally or equitably moot, the proper disposition of this matter is vacatur of the bankruptcy court's August 17th Order and remand with direction that the bankruptcy court dismiss Debtor's Motions to Assume and Assign.  As recognized by the Supreme Court of the United States on numerous occasions, the preclusive effect of the final order should be denied if a case becomes moot after entry of a final order.  *See, e.g.*, *United States v. Munsingwear*, Inc., 340 U.S. 36, 39-40 (1950).  As the Court aptly noted:

> That procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved; none is prejudiced by a decision which in the statutory scheme was only preliminary.

*Id.* Given the procedural posture of the underlying bankruptcy case (*i.e.*, a pending contested matter involving the Chapter 7 Trustee and Edwards where the interpretation and application of the APA is at issue) and the likelihood of future litigation concerning Debtor's failed sale to Edwards, vacatur and remand would be the appropriate disposition of this appeal if the Court grant GM and Edwards's motion to dismiss.

The suitability of vacatur and remand is further supported by developments since Appellant filed his Notice of Appeal in this matter.  If necessary and proper, Appellant intended to file a motion with the bankruptcy court for relief from its August 17th Order due to the discovery of new evidence which calls into question the veracity of critical testimony of GM's employee and sole witness, William Robenalt, at the July 24, 2015 hearing.  A declaration from Debtor's previous attorney, Tom Hobart, appears to violently the testimony Mr. Robenalt gave during the hearing on Debtor's Motions to Assume and Assign, upon which the bankruptcy court heavily relied in its ruling.

As set forth in more detail below, Mr. Hobart explicitly told Mr. Robenalt that Debtor intended comingle its Ford and GM operations in a single facility in emails dated December 14, 2009 and December 16, 2009 and in person during Mr. Robenalt's visit to Debtor's dealership in December 16, 2009. On December 17, 2009, Mr. Robenalt responded to Mr. Hobart's emails with written approval of Debtor's proposed course of action of comingling GM and Ford operations in a single facility.  Yet, Mr. Robenalt testified at the July 24th hearing that he was told by Debtor's representatives during his visit in December of 2009 that Debtor intended to completely segregate its GM and Ford operations and that he "absolutely [did] not" give written approval to Debtor to comingle its GM and Ford operations.  The bankruptcy court's August 17th Order is largely premised on this testimony.

By vacating the bankruptcy court's August 17th Order, which appears to be premised on false testimony, the Court will prevent its preclusive effect from infecting the remainder of the bankruptcy case and deprive GM of the opportunity from benefiting from what appears to be the false testimony of its employee.  If the Court were simply to dismiss this appeal without vacating the bankruptcy court's order, the parties would be left with no recourse with respect to the bankruptcy court's Order since this Court's determination of mootness would be binding going forward.  It is precisely this result that the Supreme Court sought to avoid with its sound ruling that when appeals become moot on account of events subsequent to a final order, the proper disposition of the appeal is vacatur and remand.

## II.     BACKGROUND

For the purposes of this Motion to Dismiss, Appellant does not disagree with Edwards's factual statements and offers the following additional statements of facts for the Court's consideration:

1.     In its August 17, 2015 Order denying Debtor's Motion to Assume and Assign its GM Franchise Agreement, the bankruptcy court found that Debtor was in default of its GM Franchise Agreement because it co-mingled its Ford and GM operations (*i.e.*, operated a "dual dealership"), which the bankruptcy court held is not permitted by the GM Franchise Agreement. (8/17/15 Order, Ex. A at 6-8.)

2.     The bankruptcy court based its ruling largely on the following finding:

> At the time that a GM Dealer Network Manager visited Gretter, Ford and GM appeared to be divided between 201 and 214 Airport Road.  Based upon that configuration there was no reason to suspect that the GM franchise agreement was in default.

(8/17/15 Order, Ex. A at 7-8.)   The GM Dealer Network Manager that visited Debtor's dealership was William Robenalt, and his visit occurred December 16, 2009. (*Id.* at 149:10-19;

150:3-10, 167:20-168:22.)  During his visit, Mr. Robenalt met with Tom Gretter and Debtor's attorney, Tom Hobart.  (*Id.* at 167:20-168:22; Appellant's Statement of Fact No. 6.)

3.       201 Airport Road was the location of Debtor's primary dealership facility, and 214 Airport Road, which is across the street from Debtor's primary dealership facility, is the location of a building, part of which was Debtor's Ford showroom, with the remainder consisting of rental storage units.  (*Id.* at 50:3-13, 51:13-24, 168:7-20; Ford's Ex.  at 7/24/15 Hrg.- picture of storage building, Ex. C.)

4.       Mr. Robenalt testified at the hearing that the reason for his visit to Debtor's dealership on December 12, 2009 was to make sure Debtor "would . . . have Ford completely removed from the [GM] operations."  (7/24/15 Hrg. Tr., Ex. B at 168:4-6.)  Mr. Robenalt also testified that he was told during his visit that Debtor was going to move its Ford service operations out of its primary dealership facility at 201 Airport Road and into Debtor's building located at 214 Airport Road by converting rental storage units into service bays.  (*Id.* at 168:7-23.)  Last, Mr. Robenalt testified that it was his understanding when he left Debtor's dealership that Debtor would have separate Ford dealership operations at 214 Airport Road.  (*Id.* at 169:5-8; Appellant's State of Fact No. 6.)

5.       On December 14, 2009, two days before Mr. Robenalt visited Debtor's dealership, Debtor's attorney, Tom Hobart, sent an email to Mr. Robenalt stating the following: (1) Debtor understood that GM had changed its facility requirements with respect to dual dealerships; (2) Debtor only needed a separate showroom for non-GM line-makes; and (3) Debtor would be in compliance with this new requirement if it established a separate Ford showroom.  (Hobart. Decl., Ex. D  ¶¶ 4, 5, Ex. 1 to Hobart Decl.)

6.     Mr. Hobart was present during Mr. Robenalt's visit to Debtor's dealership on December 16, 2009, and later that day, after Mr. Robenalt's visit, Mr. Hobart sent an email to Mr. Robenalt explicitly stating that intended to continue its Ford service operations in the same facility housing its GM operations.  (*Id.* ¶ 6, 10, Ex. 2 to Hobart Decl.)  Mr. Hobart's December 16, 2009 email to Mr. Robenalt stated, in part, the following:

> Gretters do not believe it is necessary to have a separate Ford drop off area for service and intends to continue servicing and repairing all models in the service area located in the GM Dealership. Gretters will also explore the possibility and feasibility of adding a phone line that can be answered "Gretter Ford".
>
> As a result of separating the showrooms, Gretter has complied with the Participation agreement as modified by the letter from GM of June 9, 2009.

(*Id.* ¶ 10, Ex. 2 to Hobart Decl.)

7.     During GM's counsel's direct examination of Mr. Robenalt at the July 24th hearing on Debtor's Motions to Assume and Assign, the following exchange occurred:

> Q     Has GM ever provided in writing any authorization for Gretter to operate the Ford operations at the GM dealership location?
>
> A     Absolutely not.

8.     In response to a January 17, 2009 email from Mr. Hobart requesting confirmation that Debtor was in compliance with GM's requirements by establishing a separate Ford showroom while the remainder of its Ford operations co-mingled with its GM operations in a single facility, Mr. Robenalt responded in an email on the same day that "[m]y e-mail should suffice that [Debtor] is in compliance with the Participation Agreement as amended." (*Id.* ¶ 11, Ex. 2 to Hobart Decl.)

9.     The Participation Agreement, dated June 1, 2009, referenced in Mr. Robenalt's January 17, 2009 email, contains a cross-default provision that explicitly references "Dealer Agreements" (*i.e.* the Franchise Agreement), "Summary Agreements" and "Exclusive Use

Agreements." (Participation Agreement, Ex. 1 to 1/31/16 Decl. of James Gretter, Ex. E § 7(a)-(b).)

10.     The following are the only agreements between Debtor and GM that the parties offered into evidence at the July 24th hearing on Debtor's Motion to Assume and Assign its GM Franchise Agreement: (1) the 2010 GM Franchise Agreement, (2) the 2008 GM Franchise Agreement; (3) the Summary Agreement; and (4) the Exclusive Use Agreement. (8/17/15 Order, Ex. A at 3; *see also* Appellant's Br. at 2-3 (discussing the historical context of these agreements).)

11.     Edwards's total bid for substantially all of Debtor's assets and the real estate upon which Debtor conducted its activities, but was not part of Debtor's estate, was $1,560,000. (4/2/15 Order, Ex. F)

## III.    ARGUMENT

A change in circumstances in this matter has not occurred to render the significant questions raised by this appeal moot. The Court to grant Appellant straightforward, effectual relief by reversing the bankruptcy court's August 17th Order. As demonstrated above and in Appellant's brief, the bankruptcy court's Order is premised upon a multitude of legal and factual errors, as well as apparent false testimony by GM's witness, which would be challenged should the Court vacate the bankruptcy court's order and remand for further proceedings. Debtor's facilities remain intact, unoccupied and available for purchase. As for Allied Financial's (*i.e.*, the provider of Debtor's floor plan financing for new vehicles) repossession of Debtor's new vehicle inventory, there is an insufficient record on appeal to determine whether this truly constitutes a hardship for Debtor, especially since the newest vehicles in Debtor's new vehicle

inventory were approaching one year old when Edwards would have closed on the purchase of Debtor's assets in August of 2015.

## A.      THIS APPEAL IS NOT CONSTITUTIONALLY MOOT.

The changes in circumstances since the bankruptcy court denied Debtor's Motions to Assume and Assign have not rendered this appeal moot.   Rather, Edwards raises doubts concerning whether it would be in breach of the APA if it would refuse to proceed the purchase of Debtor's assets should the Court grant Appellant's requested relief.   A court exercising appellate review is not the proper forum to determine Edwards's obligations under the APA, as a matter of first impression, nor does the existence of doubts concerning Edwards's obligations under the APA render this appeal moot.

Article III of the United States Constitution "restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013). This requirement "subsists through all stages of federal judicial proceedings, trial and appellate." *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).   "But a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id.*

Edwards's current stated position that it will not proceed with purchasing Debtor's assets does not prevent the Court from providing effective relief.   Appellant does not question the sincerity of Edwards's professed desire to walk away from the sale of Debtor's assets, but the extent that Edwards will face consequences from walking away from the sale is still in flux since one of the conditions in the APA for Edwards closing on the sale was the bankruptcy court's granting of Debtor's Motions to Assume and Assign.   Given Edwards's stated preference for walking away from the purchase of Debtor's assets, it is in Edwards's interest that the

bankruptcy court's August 17th Order denying Debtor's Motions to Assume assign not be overturned on appeal.

If the Court reversed the bankruptcy court's August 17th Order, the above stated condition in the APA would be satisfied, and Edwards, and indeed the bankruptcy court, would be faced with reassessing the parties' respective rights and obligations under the APA. For this reason, alone, the Court can grant effectual relief to Appellant if he is the prevailing party by reversing the bankruptcy court' August 17th Order. After reversal and remand, Edwards could then decide whether to close on its purchase of Debtor's assets or stand on its assertion that it is relieved from performance under the APA.

The conversion of the underlying bankruptcy case from Chapter 11 to Chapter 7 also does not render this appeal constitutionally moot. *See Pookrum v. Bank of Am., N.A.*, 512 B.R. 781, 785 (D. Md. 2014). "Though it is true that 'conversion from one chapter to another generally moots an appeal taken from an order in the original chapter,' *AmeriCredit Fin. Servs., Inc. v. Tompkins*, 604 F.3d 753, 755 (2d Cir.2010), this often refers to the equitable form of mootness." *Pookrum*, 512 B.R. at 785. "Conversion can render an appeal constitutionally moot, but . . . [a]ppeals that are found constitutionally moot after conversion are typically the result of funds being dispersed, under a Chapter 11 or 13 reorganization plan or a Chapter 7 liquidation, to people or entities that are not parties to the case." *Id.* at 785-86. (citing examples supporting proposition). "In these circumstances, a court lacks power to compel non-parties to return funds, . . . [but] [w]hen funds have been distributed only to parties, the issue is not constitutionally moot." *Id.* at 786. To be clear, when the court in *Pookrum* is referring to "funds being distributed," it is referring to instances where there trustee has distributed funds of the estate to

creditors pursuant to an approve plan, and a party files an appeal asking for relief that includes the creditors returning the funds to the estate. *See id.* at 785-86.

The court in *Pookrum*, after distinguishing cases where a distribution from the estate to creditors occurred under a confirmed plan, turned to the question of whether a procedural mechanism existed for the bankruptcy court, upon remand, to reconvert a case back to Chapter 11 when the bankruptcy court had already converted the case to Chapter 7 following entry of the order that was at issue on appeal. *Id.* at 786.  After noting that the courts are divided on whether the bankruptcy court can reconvert a case from Chapter 7 back to Chapter 11, and specifically stating that the Eighth Circuit has "not[ed] courts are split on the matter but refrain[ed] from considering the issue" the court in *Pookrum* concluded that a case could be reconverted from Chapter 7 to Chapter 11.  *Pookrum*, 512 B.R. at 786-87.

Neither is this appeal moot on account of Allied Financial's repossession of Debtor's new vehicle inventory caused this appeal to become constitutionally moot.  The only assets that were part of the bankruptcy estate when Edwards entered into the APA with Debtor that Edwards asserts are no longer present are Debtor's inventory of new cars, which were repossessed by Allied Financial, the provider of Debtor's new vehicle floor plan financing.  Upon information and belief, Ford and GM are still manufacturing new vehicles, and if Edwards's were to purchase Debtor's GM and Ford Franchise Agreements, Edwards could quickly replenish its new vehicle inventory with a mix of inventory tailored to its own desires, rather than being forced to purchase Debtor's pre-existing new vehicle inventory.  As such, whether the repossession of Debtor's new vehicle inventory constitutes a burden on Edwards is better addressed in a potential breach of contract action upon remand, at which there can be a determination of whether, as a result of

Allied Financial's repossession of Debtor's new vehicle inventory, Edwards suffered a pecuniary loss and, if so, whether Debtor committed a material breach of the APA.

GM argues the appeal is moot because the APA terminated according to its own terms. GM also claims that "neither party to the Asset Purchase Agreement disputes that fact." (GM Joinder at 1-2.)  First, the documents cited by GM do not in any way support the claim that Debtor or anyone else claiming to have an interest in the APA has ever assented to the notion that that the APA is no longer enforceable.  GM cites to an assertion made by Edwards in one of its filings and to correspondence between Edwards's attorney and GM.  Further, Appellant is not aware of any other basis for making such a claim.  As for GM's claim that the APA terminated on August 27, 2015, it does not cite to a specific provision in the APA in support of this proposition, but it is presumably relying upon the August 27, 2015 closing date stated in the APA.

### B.   APPELLANT'S DECISION TO NOT SEEK A STAY OF THE UNDERLYING BANKRUPTCY CASE DOES NOT RENDER HIS APPEAL "EQUITABLY MOOT"

Edwards's brief leads one to believe there is practically a blanket rule rendering all appeals from bankruptcy cases moot if the appellant does not seek a stay pending an appeal. (*See* Edwards's Br. at 5.) While it is possible in certain situations for an appeal to be rendered "equitably moot" when the appellant does not seek a stay of the underlying bankruptcy case, those situations almost invariably concern a bankruptcy granting affirmative relief to transfer property out of the estate to a third party, and even then, most of those instances concern the distribution of property out of the estate pursuant to a confirmed plain of reorganization.  *In re Williams*, 256 B.R. 885, 896 (B.A.P. 8th Cir. 2001).  Given this reality, it is not surprising that the cases cited by Edwards all concern matter where property was transferred out of the estate

11

with court approval.  *See In re Cont'l Airlines*, 91 F.3d 553, 561 (3d Cir. 1996) (affirming the district court's ruling that the Trustee's appeal was equitably moot because, among other things, there had been substantial consummation of the reorganization plan, including a $450 million investment into the reorganized entity); *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) (holding that an appeal was not equitably moot, despite the uncertainty with respect to the money at stake and what parties may be liable, because all potential liable parties were before the court and the bankruptcy court could order the return of money); *In re Crystal Oil Co.*, 854 F.2d 79, 82 (5th Cir. 1988) (holding that a creditor seeking review of a confirmed plan for reorganization should have sought a stay "so the reviewing court could consider the plan's propriety before implementation led third parties to make commitments in reliance on the plan).

"The doctrine of equitable mootness is most often applied in the context of a reorganization bankruptcy where the bankruptcy court has confirmed a plan, the plan has been substantially consummated, and then a party seeks appellate review of an issue that, if upset, would unduly disturb the plan."  *In re Williams*, 256 B.R. 885, 896 (B.A.P. 8th Cir. 2001) (collecting sources).  In *Williams*, a Chapter 13 case was dismissed prior to confirmation of a plan.  *Id.* at 897.  In support of its conclusion that the Debtor's appeal was not "equitably moot," the court reasoned, "[i]f equitable mootness is indeed a doctrine limited to preventing the imprudent upset of a substantially consummated plan of reorganization, as it has been in most of the cases, the doctrine would not apply, because this case presents an inapposite factual context." *Id.*  Therefore, the court observed, therefore, an appeal, whatever the substance, cannot disturb "the plan," cannot impede the success of implementing the plan, and cannot adversely affect third parties who have relied on the plan and are not before the court at this time. If we view the

doctrine broadly, applying it to all appeals in which there has been a 'comprehensive change of circumstances'" *Id.* at 897 (footnote omitted).

In this matter, the bankruptcy court did not grant affirmative relief, upon which third parties have made commitments in reliance thereon. Further, there have not been other developments that would render the relief Appellant seeks in this appeal inequitable. Greatly condensing Edwards's arguments concerning equitable mootness, it asserts there are two grounds supporting the conclusion that this appeal is equitably moot: (1) Edwards is forced to continue to participate in this matter while incurring attorney's fees; and (2) Debtor's new vehicle inventory was repossessed by Allied Financial, with leave of the court. As for Edwards's first basis, it proves too much. If the participation in an appeal while incurring attorney's fees was a sufficient basis to conclude appeals were equitably moot, there would rarely be an appeal. Further, Edwards's does not explain why it must participate in this appeal. To conclude this appeal is moot, the APA Edwards entered into with Debtor must be unenforceable, and if Edwards was certain that was the case, it would have no to participate in this appeal.

The only affirmative, non-conclusory, assertion by GM and Edwards concerning the disposition of property from Debtor's estate is Allied Financial's repossession of Debtor's new vehicle inventory, in which Allied Financial had a perfected, uncontested, firs position lien. Upon information and belief, Debtor's dealership facilities remain vacant, remain in the same condition as the last day Debtor was open for business (with the exception of winterization and other precautions to preserve the facilities), and are available for purchase Washington State Bank and Hills Bank for amount Edwards previously agreed to pay. Further, even if Debtor's facilities were no longer available for purchase, a proposition which Appellant denies, the implications of that development would be better determined by the bankruptcy court on remand

13

when determining whether Edwards was contractually required to go forward with the purchase of Debtor's assets.  The same is true with respect to Edwards's claim that the repossession of Debtor's new vehicle inventory.  At the time Edwards would have closed on the purchase of Debtor's assets, the most recently delivered new cars were approaching one year old, with a substantial portion of Debtor's new vehicle inventory being older.  Far from being a detriment to Edwards, Allied Financial's reposition of Debtor's new car inventory could amount to a windfall for Edwards since it would be able to start afresh with present model year new vehicles, ordered according to its preferences.

Edwards is attempting to raise a breach of contract claim for the first time in an appellate proceeding with its "equitable mootness" argument.  Should the Court reverse or vacate the bankruptcy court's Order, the bankruptcy court, upon remand, would then be tasked with determining whether Edwards would be in breach of the APA if it refused to close on the sale of Debtor's assets.  If Edwards intended to not be called upon to perform pursuant to the APA if the bankruptcy court denied Debtor's Motions to Assume and Assign and a subsequent appeal ensued, it was incumbent on Edwards to draft the APA accordingly.  Had Edwards done so, it could then refuse to close on the purchase of Debtor's assets upon remand form this Court.  Whether or not Edwards would be in breach of the APA should it not follow through with purchasing Debtor's assets in the event the Court reverses or vacates the bankruptcy court's August 17, 2015 Order would require a fact intensive determination that is not ripe for adjudication at this time and is well beyond the scope of appellate review in this matter.

**C.**   **IF THIS APPEAL IS MOOT, THE COURT SHOULD VACATE THE AUGUST 17TH ORDER AND REMAND THIS MATTER WITH DIRECTION TO THE BANKRUPTCY COURT TO DISMISS DEBTOR'S MOTIONS TO ASSUME AND ASSIGN.**

GM and Edwards assert that events following the bankruptcy court's August 17, 2015 Order have mooted this appeal.[1]  "The course to be followed by federal courts with respect to mooted appeals was not always clear.  13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3533.10 (3d ed.).  "The matter was settled, however, in *United States v. Munsingwear*, which established both the proper course and a procedural condition." *Id.* (footnote omitted).  "The established practice . . . in dealing with a civil case from a court in the federal system which has become moot while  . . . pending [a] decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 71 S. Ct. 104, 106 (1950); *see also In re Smith*, 921 F.2d 136, 139 (8th Cir. 1990) (citing *Munsingwear* in support of vacatur and remand of moot appeal in bankruptcy case).  "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, [the Court] ha[s] emphasized, ought not in fairness be forced to acquiesce in that ruling." *Camreta v. Greene*, 131 S. Ct. 2020, 2035 (2011) (quotations omitted).  "That [is] the duty of the appellate court." *Munsingwear*, 71 S. Ct. at 106-07.

"The point of vacatur is to prevent an unreviewable decision from spawning any legal consequences, so that no party is harmed by what . . . [the Supreme Court] ha[s] called a

---

[1] If, on the other hand, GM and Edwards would to argue in the alternative that events preceding the bankruptcy court's August 17, 2015 mooted Debtor's Motions to Assume and Assign, the argument for vacating the Order would apply with equal force. *See In re Burrell*, 415 F.3d 994, 998 (9th Cir. 2005) ("If the controversy is moot, both the trial and appellate courts lack subject matter jurisdiction").

preliminary adjudication." *Camreta*, 131 S. Ct. at 2035 (quotations omitted); *see also Teague v. Cooper*, 720 F.3d 973, 978 (8th Cir. 2013).   "That procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Munsingwear*, 71 S. Ct. at 107.

In *Deakins v. Monaghan*, the Supreme Court considered whether vacatur and remand was the appropriate disposition of an appeal that became moot under somewhat similar circumstances to those presented in this matter.   Respondents in *Deakins* instituted a civil rights suit in a federal district court after New Jersey law enforcement officers executed a search warrant at their business and seized various documents.   *Deakins v. Monaghan*, 108 S. Ct. 523, 526 (1988). Respondents sought equitable relief, including the return of all documents seized by the officers, and compensatory and punitive damages for the alleged violations of their rights.   *Id.* Petitioners, the officers who executed the warrant, filed a motion to dismiss respondents' federal suit, arguing that the existence of an ongoing state grand jury investigation required the federal court to abstain from adjudicating disputes arising from that investigation, and respondents countered with a motion for a preliminary injunction directing the return of the documents.   *Id.* at 526-27.   While these events were occurring, the New Jersey state court that issued the warrant ordered the seized documents sealed.   *Id.* at 527.   Several months later, the district court granted petitioner's motion to dismiss on abstention grounds and denied respondent's motion for preliminary injunction.   *Id.*

On appeal, the Court of Appeals for the Third Circuit affirmed the district court's denial of the preliminary injunction but reversed the judgment dismissing the complaint.   *Id.*   The panel, however, ruled that the district court was not required to abstain from adjudicating respondents equitable claims for injunctive relief relating to the ongoing grand jury activities under *Younger*

*v. Harris*.  *Id.*  The panel also reversed the district court with respect to respondents' claims for money damages and attorney's fees, holding that the district court was required to stay, rather than dismiss, respondents' federal claims that were not cognizable under New Jersey law.  *Id.*  Petitioners' appealed the Third Circuit's opinion.  *Id.* at 528

After the Third Circuit entered judgment, the state grand jury returned an indictment against the respondents.  *Id.* at 527.  The New Jersey state court, to which the indictment was assigned, assumed jurisdiction over respondents' equitable claim for the return of the seized documents, which were still being maintained under seal.  *Id.*  The New Jersey state court then ruled that certain documents were seized in violation of the attorney-client privilege and ordered them returned to respondents.  *Id.*  "In light of these developments, all six respondents represent[ed], through common counsel, that they [did] not wish to pursue their claims for equitable relief in federal court" and that [t]hey wish[ed] to withdraw th[ose] claims from their federal complaint and seek injunctive relief exclusively in the state proceedings initiated by the indictment."  *Id.*  "Respondents also represent that, if the complaint were remanded to the District Court, they would seek a stay of all federal proceedings on the damages claims pending resolution of the state proceedings."  *Id.* at 527-28.

The Supreme Court held that the there was "no longer is a live controversy between the parties over whether a federal court can hear respondents' equitable claims" because "respondents state[d] that they no longer [sought] any equitable relief in federal court."  *Id.* at 528.  Petitioners argued a live case or controversy remained concerning respondents' equitable claim because "nothing . . . prevent[ed] respondents . . . from nullifying that amendment" of their

pending federal complaint "by further amendment or from filing a new complaint if they are dissatisfied with the relief obtained in the state criminal proceeding."[2]  *Id.*

The Supreme Court rejected petitioners' argument and ordered the judgment of the lower court "vacated with directions to the District Court to dismiss the relevant portion of the complaint."  *Id.* at 528.  (citing *Munsingwear*, 71 S. Ct. at 106-07).  In support of its holding, the Court stated that "[p]etitioners misconceive[d] the effect respondents' representations and our reliance thereon will have on the shape of the federal litigation."  *Id.*  The Court explained that vacatur and remand "strips the decision below of its binding effect[,] [a]nd respondents can be prevented from reviving their claims by the order of dismissal."  *Id.*  This was so "[b]ecause th[e] case was rendered moot in part by respondents' willingness permanently to withdraw their equitable claims from their federal action, [and therefore] a dismissal with prejudice [was] indicated."  *Id.*

The same exact outcome will be achieved in this matter should the Court vacate the bankruptcy court's August 17th Order.  Vacatur will "prevent an unreviewable decision from spawning any legal consequences [from] . . . a preliminary adjudication."  *Camreta*, 131 S. Ct. at 2035 (quotations omitted), "clear[] the path for future relitigation of the issues between the

---

[2] Appellant notes that his argument with respect to Edwards's stated intention to not purchase Debtor's assets is qualitatively different than the respondents' representation in *Deakins* that they no longer desired to pursue their claim for equitable relief in federal court.  In *Deakins*, the viability of respondents' equitable relief claim was not affected by their selection of forum to pursue the claim.  Whereas in this matter, Edwards would be left in a better position with respect to its obligations under the APA should bankruptcy court's August 17th Order stand given its desire to not purchase Debtor's assets.

parties[,] and eliminate[] a judgment, review of which was prevented through happenstance." *Munsingwear*, 71 S. Ct. at 107.

Both Edwards and GM hint at arguments concerning Appellants standing to pursue this appeal.  The Court does not need to reach the issue of Appellant's standing before vacating the Bankruptcy Court's August 17th Order.  "A district-court decision may be vacated even though mootness first occurs after the decision and it is not clear whether the appellants had standing to appeal."  13C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3533.10 (3d ed.)  "At least at times, it is enough that there was an arguable basis for seeking appellate review."  *Id.* (citing the *Arizonans for Official English v. Arizona*, 117 S. Ct. 1055, 1071 (1997).  As set forth more fully in Appellant's Brief, he has more than an arguable basis for standing on this appeal via his subrogation rights running through Washington State Bank. (Appellant's Br. 24-30.); *see also In re Cult Awareness Network, Inc.*, 151 F.3d 605, 610 (7th Cir. 1998) ("creditors have standing to object to the bankruptcy order" approving the sale of Debtor's assets because they are "the recipients of the proceeds of the estate" and therefore "have a pecuniary stake in the manner in which the estate is liquidated")

The questions Mr. Hobart's declaration raises about GM's actions during the hearing on Debtor's Motions to Assume and Assign further support vacatur and remand.  Appellant believes the facts outline above speak for themselves. With the portions of Mr. Robenalt's testimony that are directly contradicted by emails the emails between him and Mr. Hobart, it is very likely the bankruptcy court would have approved Debtor's Motions to Assume and Assign.  This raises real and significant questions concerning GM's liability for interfering in the sale of substantially all of Debtor's assets and related real estate to Edwards for an agreed to price of $1,560,000. The Court should "clear[] the path for future []litigation of the issues between the parties"

concerning Debtor's failure to consummate the sale to Edwards and "eliminates a judgment, review of which was prevented through happenstance." *Munsingwear*, 71 S. Ct. at 107.

**WHEREFORE**, Appellant James Gretter respectfully requests that this Court deny Edwards's and GM's Motion to Dismiss Appeal, or in the alternative, vacate the bankruptcy court's August 17th Order and remand with direction to dismiss Debtor's Motions to Assume and Assign, such additional relief the Court deems just and proper.

*/s/ James M. Gretter*
JAMES M. GRETTER
1200 Main St., Ste. 2200
Kansas City, Missouri 64105
Telephone:  (816) 472-7474
Facsimile:  (816) 472-6262
Email:  jgretter@fwpclaw.com
*PRO SE* **APPELLANT/CREDITOR**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury, that a copy of his document was served electronically on all parties who receive electronic notice through CM/ECF on this 4th day of February, 2016.

*/s/ James M. Gretter*