IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| In re GRETTER AUTOLAND, INC., | ) | Case No. 3:15-cv-00117-SMR-HCA |
| | ) | |
| Debtor. | ) | |
| | ) | ORDER GRANTING MOTION |
| | ) | TO DISMISS APPEAL |

Before the Court is a joint Motion to Dismiss Appeal filed by Edwards Auto Plaza, Inc.

("Edwards") and General Motors LLC ("GM").   [ECF Nos. 22 (Edwards motion); 27 (GM

joinder)].   Edwards and GM seek to dismiss the appeal filed pro se by James M. Gretter ("Gretter"),

[ECF No. 1], from a decision of the United States Bankruptcy Court for the Southern District of

Iowa ("Bankruptcy Court") in Bankruptcy Petition No. 14-02831-als7.[1]   Gretter responded to the

motion to dismiss, [ECF No. 31], and Edwards and GM both replied, [ECF Nos. 36 (GM); 39

(Edwards)].   After further developments in the bankruptcy case, the parties filed supplemental

briefs.   [ECF Nos. 52 (GM); 53 (Edwards); 54 (Gretter)].   The matter is now fully submitted.

Because the Court finds Gretter's appeal is equitably moot and vacatur is not warranted, the Court

grants the Motion to Dismiss Appeal.

## I.  PROCEDURAL HISTORY

The procedural history of this case is quite lengthy and complicated.   It began when three

auto dealerships—Gretter Autoland, Inc.; Gretter Ford Mercury, Inc.; and Gretter Chevrolet

Company, Inc. ("the Dealerships")—filed for Chapter 11 bankruptcy on December 1, 2014.

---

[1] For purposes of this Order, the Court will use [Bankr. ECF No.] to refer to entries on the docket in Bankruptcy Petition No. 14-02831-als7.   The underlying bankruptcy case is jointly administered with *In re Gretter Ford Mercury, Inc.*, Case No. 14-02832-als; and *In re Gretter Chevrolet*, Case No. 14-02833-als.

[Bankr. ECF No. 1].  As the Bankruptcy Court once explained, "In an effort to preserve [the value of the Dealerships,] Gretter wanted to sell its dealerships as going concerns in bankruptcy.  Due to the financial condition of the company, time was of the essence to accomplish this goal."  [Bankr. ECF No. 255 at 2].

### A.   Motion for Order Approving Sale

On February 18, 2015, the Dealerships filed a motion asking for the Bankruptcy Court's approval of a sale of substantially all their assets, free and clear of all liens, claims, and encumbrances.  [Bankr. ECF No. 84; ECF No. 7-11 at 282–294].  The Dealerships advised that they had reached a preliminary agreement with Edwards for the sale of all of their assets, and that a purchase agreement incorporating the terms of the preliminary agreement would soon follow.  [Bankr. ECF No. 84 at 2; ECF No. 7-11 at 283].  The motion stated: "The [Dealerships are] informed and believe[] that [Edwards's] interest in purchasing the [Dealerships'] car dealership business is conditioned on the dealership[s] remaining open as a going concern."  [Bankr. ECF No. 84 at 4; ECF No. 7-11 at 285].[2]  A letter of intent from Edwards was attached to the motion, wherein Edwards stated "[t]his agreement is contingent [on] . . . factory approval by GM and Ford. . . . Our only contingency is based on factory approval of the Ford franchise. We are currently a GM dealer and should have no issue getting approved."  [Bankr. ECF No. 84 at 13; ECF No. 7-11 at 294].

---

[2] The Bankruptcy Court directed the Dealerships to docket the Motion for Order Approving Sale as a Motion to Assume, Reject, or Assign Executory Contracts.  [Bankr. ECF No. 373 at 5]. The Dealerships did so, and Docket Entry 85 is identical to Docket Entry 84, except for the Docket caption.

### B.  APA

On March 16, 2015, Thomas D. Gretter, acting on behalf of the Dealerships, entered into an Asset Purchase Agreement ("APA") with Edwards.  [Bankr. ECF No. 106-1; ECF No. 28-5].  Pursuant to the APA, Edwards would purchase all of the Dealerships' inventory, personal property, intellectual property, intangible assets, records, goodwill, and going concern value.  [Bankr. ECF No. 106-1 at 1–2; ECF No. 28-5 at 1–2].  The APA contemplated that Edwards[3] would enter into a separate purchase agreement with "Thomas D. Gretter (or other titleholder) for the purchase of the real estate and building located at 201 S. Airport Road, Washington, IA 52353" for $750,000.00 and into another purchase agreement with "John D. Gretter and James M. Gretter (or other titleholders) for the purchase of the real estate and building located at 214 S. Airport Road, Washington, IA 52353" for $100,000.00.  [Bankr. ECF No. 106-1 at 6; ECF No. 28-5 at 6].  An inventory list was included with the APA, as was a list of the Dealerships' employees and the details of the employee agreements with the Dealerships.  [Bankr. ECF No. 106-1 at 9; ECF No. 28-5 at 9].  The APA also included the following covenant:

> **5.1    Conduct of Business.** During the period from the Effective Date to the Closing Date, subject to applicable bankruptcy law, [the Dealerships] shall conduct [their business] as operated on the date of this Agreement and use [their] best efforts to preserve substantially intact the Assets, keep available the services of [the Dealerships'] employees, officers and directors and maintain [their] present relationships with customers, suppliers and others having significant business relationships with [them].

[Bankr. ECF No. 106-1 at 10; ECF No. 28-5 at 10].

Edwards was also to purchase a designated list of the Dealerships' contracts ("the Purchased Contracts"), which included a Ford Dealership Agreement and a GM Dealership

---

[3] More specifically, "[a] special purpose entity formed by [Edwards] or [Edwards's] affiliate" was to buy these properties.  [Bankr. ECF No. 106-1 at 6; ECF No. 28-5 at 6].

Agreement.  [Bankr. ECF No. 106-1 at 2, 28; ECF No. 28-5 at 2, 28].  In order for Edwards to purchase these contracts, the APA directed that the Dealerships would assume and assign their contracts over to Edwards.  [Bankr. ECF No. 106-1 at 13; ECF No. 28-5 at 13].  In the event of a dispute regarding Edwards's ability to provide adequate assurance of future performance of any of these contracts, the APA left resolution of the dispute to the Bankruptcy Court.  *Id.*

The APA contained several conditions precedent to Edwards's performance. For one, the Dealerships needed to obtain any necessary manufacturer consents.  [Bankr. ECF No. 106-1 at 6; ECF No. 28-5 at 6].  In other words, the Dealerships needed to secure "the written consents of Ford and GM, respectively, consenting to the transfer of the Franchises to [Edwards], or otherwise authorizing or approving of [Edwards] as an authorized dealer of such manufacturer."  [Bankr. ECF No. 106-1 at 22; ECF No. 28-5 at 22]. For another, the Bankruptcy Court needed to approve the transaction.  [Bankr. ECF No. 106-1 at 6; ECF No. 28-5 at 6].  To this end, the APA contemplated that the Dealerships would obtain a Transaction Approval Order from the Bankruptcy Court that (1) approved the sale; (2) approved Edwards's assumption of the Purchased Contracts; and (3) found Edwards was a good faith purchaser entitled to the protections of the Bankruptcy Code.  [Bankr. ECF No. 106-1 at 13; ECF No. 28-5 at 13].

A specific closing date was not set forth in the APA; closing was instead to occur when the conditions precedent were satisfied or on a mutually agreed upon date.  [Bankr. ECF No. 106-1 at 4; ECF No. 28-5 at 4].  The parties agreed to cooperate in closing the transaction as soon as possible after the Bankruptcy Court issued the Transaction Approval Order.  *Id.*  Edwards submitted a deposit of $75,000, returnable if the closing did not occur by April 30, 2015.  [Bankr. ECF No. 106-1 at 7; ECF No. 28-5 at 7].  The parties further agreed that the APA would terminate and be abandoned if, at any time prior to the closing date, (1) any of the conditions precedent were

-4-

not fulfilled or (2) the Bankruptcy Court rejected the Transaction Approval Order. [Bankr. ECF No. 106-1 at 14; ECF No. 28-5 at 14]. The APA granted the parties the ability to extend the time for performance of any obligation under the APA or to waive compliance by the other party with any of the terms. [Bankr. ECF No. 106-1 at 16; ECF No. 28-5 at 16].

### C.   GM and Ford Objections to APA

GM and Ford both filed objections to the Motion for Order Approving Sale. [Bankr. ECF Nos. 108 (GM); 109 (Ford); ECF No. 7-12 at 1–5 (GM), 59–63 (Ford)]. Ford complained that it had not been provided with adequate assurance of future performance by the Dealerships or Edwards. [Bankr. ECF No. 109 ¶ 5; ECF No. 7-12 at 60]. Ford also asked that any order approving a sale recognize Ford's contractual right to approve any proposed assignee. [Bankr. ECF No. 109 at 2; ECF No. 7-12 at 2]. Likewise, GM highlighted its right under the GM Dealer Agreement[4] to approve any assignment. [Bankr. ECF No. 108 at 2; ECF No. 7-12 at 2]. And, under the GM Dealer Agreement, if GM did not approve of the assignment, it was within GM's rights to immediately terminate the GM Dealership Agreement. *Id.* GM asked that the Bankruptcy Court's approval of the sale to Edwards be conditioned upon GM's approval. [Bankr. ECF No. 108 at 4; ECF No. 7-12 at 4].

### D.   March 27, 2015 Hearing and March 30, 2015 Order

The Bankruptcy Court held a hearing on the Motion for Order Approving Sale on March 27, 2015. [Bankr. ECF No. 373]. After the hearing, on March 30, 2015, the Bankruptcy

---

[4] The letter of intent from Edwards (and the APA) referred to a "GM Franchise," which GM took to mean that the Dealerships "contemplate[d] the assumption and assignment of the GM Dealer Agreement." [Bankr. ECF No. 108 at 2]. The Court accepts that "Ford Franchise Agreement" is another name for the "Ford Sales and Service Agreement" and that "GM Franchise Agreement" is another name for the "GM Dealer Agreement." For the purposes of this ruling, franchises and dealership agreements are taken to be one and the same.

Court ruled that the GM and Ford Dealership Agreements "cannot be transferred or assigned absent consent of [GM or Ford,] which will not be determined until the successful buyer is identified and vetted." [Bankr. ECF No. 134 at 1; ECF No. 7-12 at 70]. The Court sustained GM's and Ford's objections to Edwards's assumption of their respective Dealership Agreements. [Bankr. ECF Nos. 134 at 2; 109 (Ford objection); 108 (GM objection); ECF No. 7-12 at 70–71].

### E.   Amendments to APA

On May 13, 2015, the Dealerships and Edwards revised the APA to conditionally eliminate the condition precedent of receiving manufacturer consents. [Bankr. ECF No. 160-1 at 17]. The Dealerships and Edwards again revised the APA on June 5, 2015. This Second Amended APA voided the May 13, 2015 APA revision.

The Second Amended APA's primary change was to remove the condition precedent of manufacturer consents, in tandem with adding the following condition precedent:

> [Edwards] shall not be obligated to close without GM's and Ford's prior approval *unless*:
>
> > (i) the Bankruptcy Court first effectively nullifies its March 30, 2015 Order (the "Order") by eliminating or effectively nullifying the second sentence of *Finding No. 3* ("These contracts cannot be transferred or assigned absent consent of these entities which will not be determined until the successful buyer is identified and vetted.") and *Order No. 3* ("The objections filed by General Motors, LLC at docket number 107 and Ford Motor Company at docket number 109 are sustained.") (collectively the "Language"), and does not insert any similar language in any other order, or
> >
> > (ii) the Bankruptcy Court shall grant assumption and assignment of the manufacturer contracts and the assumption and assignment order shall include language that effectively nullifies the Language in the Order, with the resulting effect that the manufacturers are granted no more rights with respect to the franchisor-franchisee relationship than those afforded under Iowa Code Chapter 322A.

[Bankr. ECF No. 186-1 at 2 (paragraph breaks added)]. Additionally, the parties agreed:

> This Agreement is *not* subject to Ford or GM's prior approval of [Edwards]. [Edwards] enters into this transaction in reliance on Iowa Code Chapter 322A and specifically, without limitation, Section 322A.12 which addresses sale and transfer of ownership and states that notwithstanding a franchise agreement, a franchiser shall give effect to such transfers so long as the buyer can obtain a dealer's license.

*Id.* at 3 (internal quotation marks omitted).

The Second Amended APA also changed the purchase price for the 201 South Airport Road property to $877,065.00 and the purchase price for the 214 South Airport Road property to $116,985.00. *Id.* at 2. For purposes of Edwards's deposit, the deadline for closing was changed to July 15, 2015. *Id.* at 3. And beginning May 29, 2015, Edwards was to supply up to $40,000/month towards the Dealerships' bona fide monthly operations losses. *Id.* Edwards was authorized to supply a general sales manager to manage sales at the Dealerships and to supply vehicles for sale at the Dealerships. *Id.*

### F. Subsequent Motions by the Dealerships and Edwards

After the first amendment to the APA, on May 29, 2015, the Dealerships filed two motions: a motion to assume and assign the Ford Sales and Service Agreement, [Bankr. ECF No. 168], and a motion to assume and assign the GM Dealer Agreement, [Bankr. ECF No. 169; ECF No. 2-1], (collectively, "Motions to Assume and Assign").

After revising the APA a second time, Edwards filed a motion asking the Bankruptcy Court to revise its earlier ruling, [Bankr. ECF No. 134 at 2], in which it sustained GM's and Ford's objections to Edwards's assumption of their respective Dealership Agreements. [Bankr. ECF No. 186]. Edwards requested that the Bankruptcy Court strike the statement from its March 30, 2015 ruling, [Bankr. ECF No. 134 at 1], that the Dealership Agreements "cannot be transferred or assigned absent consent of these entities which will not be determined until the successful buyer is identified and vetted." [Bankr. ECF No. 186 at 1–2]. Edwards asked that the

language be replaced with: "It is not the intent of this Court that any language in its prior Orders or Findings, with respect to the issue of manufacturers' consent, shall take priority over or pre-empt ICA 322A.12."  [Bankr. ECF No. 186 at 2].

Edwards explained its belief that, "[u]nder Iowa franchise law, provided that an asset purchase agreement is not subject to and conditioned upon manufacturers' consent, franchises are fully transferrable to a buyer without any manufacturer's prior 'consent,' 'identification' or 'vetting.'"  *Id.* at 5.  Yet, Edwards continued, the Bankruptcy Court's language in the March 30, 2015 order had "emboldened Ford to act in contravention to Iowa franchise law."  *Id.* Edwards reported that Ford would not agree to transfer its Dealership Agreement to Edwards without additional special conditions that Edwards had not imposed on the Dealerships.  *Id.* at 3. Edwards stated that these special conditions would "likely render the acquisition of [the Dealerships'] assets economically unfeasible."  *Id.*  In Edwards's view, the special preconditions imposed by Ford were contrary to Iowa law.

Edwards further explained that it wished to complete its purchase of the Dealerships as soon as possible "in order to preserve the going concern value of [the Dealerships.]"  *Id.*  Edwards warned that the Dealerships could not continue to operate "for much longer due to [their] inability to obtain additional financing for operating expenses" and "[i]f [the Dealerships] cease[] to operate . . . the sale to Edwards will in all likelihood not take place."  *Id.*

### G.  Ally Repossession of Vehicles

On February 12, 2015, Ally Financial Inc. ("Ally"), a creditor of the Dealerships, filed a Motion for Relief from the Automatic Stay.  [Bankr. ECF No. 78; ECF No. 24-1].  Ally alleged that the Dealerships were in default on their obligations to Ally; the Dealerships' obligations were secured by the Dealerships' inventory of vehicles and other collateral; and the vehicles and

collateral were not adequately protected.  Ally sought an order authorizing it to foreclose its security interest against the vehicles and collateral.  *Id.*

Ally's Motion for Relief from the Automatic Stay was discussed at a July 24, 2015 hearing.[5]  The parties informed the Bankruptcy Court that objections to the motion were withdrawn.  [Bankr. ECF No. 340 at 8–10; ECF No. 31-2 at 8–10].  Pursuant to the discussion at the hearing, the Bankruptcy Court entered an order stating that the Motion for Relief from the Automatic Stay would be granted, but that the order lifting the stay would be deferred until the Court ruled on the Dealerships' Motions to Assume and Assign.  [Bankr. ECF No. 237].

Then, on August 10, 2015, Ally filed a Motion to Give Immediate Effect to the Relief from the Automatic Stay Order.  Ally explained that it had believed the Bankruptcy Court would rule on the Dealerships' Motions to Assume and Assign in early August, but that had not happened; the Bankruptcy Court had instead scheduled an additional hearing on the Dealerships' Motion to Assume and Assign for August 17, 2015.  [Bankr. ECF No. 250 at 2; ECF No. 24-2 at 2].  Ally stated,

> The unforeseen delay in ruling on Debtor's Motions to Assume and Assign and the lack of funds available to Debtor to dealership expenses gives rise to the possibility that Debtor will be unable to keep the dealerships open which in turn places Ally's Collateral in jeopardy.

[Bankr. ECF No. 250 at 3; ECF No. 24-2 at 3].  Ally thus requested that the Bankruptcy Court allow Ally to repossess its collateral immediately, rather than waiting for the forthcoming ruling on the Dealerships' Motions to Assume and Assign.  *Id.*

---

[5] The Bankruptcy Court had considered this request previously at the March 27, 2015 hearing.  [*See* Bankr. ECF No. 373 (transcript of hearing)].  Ally requested that it be allowed to take possession of any vehicles that were not part of the sale to Edwards.  *Id.* at 151.  Ally planned to work on a stipulation respecting the vehicle repossession.  *Id.* at 151–52.  The Bankruptcy Court therefore deferred ruling on the Motion for Relief from the Automatic Stay.  [Bankr. ECF No. 135].

No objection was filed, and the Bankruptcy Court granted Ally's Motion for Relief from the Automatic Stay on August 17, 2015, "[p]ursuant to the parties' stipulation." [Bankr. ECF No. 257; ECF No. 24-3].

### H.   Bankruptcy Rejection of Transaction Approval Order

The Bankruptcy Court issued its Memorandum of Decision on the Dealerships' Motions to Assume and Assign on August 17, 2015.  [Bankr. ECF No. 255].  The Bankruptcy Court found the Dealerships were in default of the GM and Ford Dealership Agreements because the Dealerships had co-mingled the sales and service of Ford and GM vehicles.  *Id.* at 6.  Neither GM nor Ford allowed such comingling under their Dealership Agreements.  The Bankruptcy Court further found that there was no "'adequate assurance of future performance'" by Edwards because Edwards intended to continue to operate a dual GM/Ford facility.  *Id.* at 8–9 (quoting 11 U.S.C. § 365(f)(3)).  And the Bankruptcy Court was unconvinced that Iowa Code Chapter 322A required GM and Ford to allow assignment.  *Id.* at 9.  Therefore, the Bankruptcy Court denied the Dealerships' Motions to Assume and Assign.  *Id.* at 10.

### I.   Motion to Convert to Chapter 7

On August 17, 2015, after the Bankruptcy Court issued its ruling denying the Dealerships Motions to Assume and Assign, the United States Trustee ("Trustee") was informed that Edwards intended to revoke its offer to purchase due to continuing issues with Ford and GM.  [Bankr. ECF No. 258 ¶ 11].  The next day, the Trustee moved to convert the case to Chapter 7.  The Trustee explained, "[the Dealerships'] monthly operating reports indicate the estate has been operating at a net operating loss. Ally Bank has been granted relief from stay allowing it to take possession of vehicles subject to its lien.  Finally, with the failure of the sale, [the Dealerships] have been unable to obtain post-petition financing that would allow it to maintain an inventory of new vehicles for

sale." *Id.* ¶ 18.  So, because the Dealerships had failed to sell the assets of the estate or propose a plan of reorganization, and because the Dealerships continued to lose money, the Trustee asked the Bankruptcy Court to convert the case to Chapter 7.

### J.   Transfer of Dealership Real Estate

On August 25, 2015, Washington State Bank requested permission to enforce its lien on the Gretter Autoland, Inc. commercial real estate, located at 201 South Airport Road, Washington, Iowa.  [Bankr. ECF No. 268 at 2–4].  Washington State Bank reiterated that the Dealerships had recently terminated their business operations, the Trustee was seeking conversion to Chapter 7, and Ally had repossessed its financed vehicles from the Dealerships.  *Id.* at 3.

There was no objection to Washington State Bank's motion, and the Bankruptcy Court granted it permission to repossess the Gretter Autoland, Inc. property.  [Bankr. ECF No. 282].  On December 10, 2015, Thomas D. Gretter conveyed the 201 South Airport Road property to Washington State Bank.  [ECF No. 52-1 at 4–5].

In addition, John D. Gretter and James M. Gretter conveyed the 214 South Airport Road property to Hills Bank & Trust Company on November 30, 2015.  *Id.* at 7–9.

### K.   Gretter's Bankruptcy Filings

On August 28, 2015, Gretter filed an appearance in the bankruptcy case.  [Bankr. ECF No. 270].  Gretter subsequently filed a motion to reconsider the Bankruptcy Court's denial of the Motions to Assume and Assign, [Bankr ECF No. 272], as well as an objection to Chapter 7 conversion, [Bankr. ECF No. 274].

In his motion to reconsider, Gretter maintained that Iowa Code Chapter 322A dictates that GM and Ford must allow the Dealerships to assign the Dealership Agreements to Edwards.  [Bankr. ECF No. 272].  The Dealerships joined in Gretter's motion to reconsider, [Bankr. ECF

-11-

No. 281], while the Trustee, Edwards, GM, and Ford objected, [Bankr. ECF Nos. 283 (Trustee objection); 291 (Trustee amended objection); 293 (Trustee support document); 299 (Ford objection); 304 (Edwards objection); 305 (GM objection); ECF Nos. 7-18 at 1–24 (GM objection)].

In its objection to Gretter's motion for reconsideration, Edwards formally withdrew its support for the Dealerships' Motions to Assume and Assign, stating, "Edwards no longer believes any purchase can be completed under the terms of the Asset Purchase Agreement.  The asset Edwards intended to purchase no longer exists.  Edwards is not engaged at this time in efforts to acquire Debtor's GM franchise or the underlying real estate." [Bankr. ECF No. 304 at 1].  Edwards further explained:

> Testimony at the July 24, 2015, hearing on [the Dealerships'] Motions to Assume and Assign, together with documents that became known immediately prior to the hearing, led Edwards to reach the conclusion that [the Dealerships] had misrepresented key issues to Edwards and that [the Dealerships] would not be able to cure these issues.  Edwards sent correspondence to [the Dealerships'] counsel on July 29, 2015, regarding these issues, demanding that [the Dealerships] advise regarding cures and demanding that Edwards'[s] $75,000.00 deposit be returned to Edwards. . . . Edwards sought to give [the Dealerships] an opportunity to present a plan to cure.  Edwards received no response whatsoever and no cures have been made.  Edwards later terminated the Asset Purchase Agreement in accordance with its terms.

*Id.* at 1–2.

In his objection to Chapter 7 conversion, Gretter acknowledged that Ally had taken possession of the Dealerships' new car inventory and that the Dealerships had ceased operations to preserve capital.  [Bankr. ECF No. 274 ¶¶ 5–6].  But Gretter asked the Bankruptcy Court to delay conversion until after it ruled on Gretter's pending motion to reconsider and, if the Bankruptcy Court ruled adversely to Gretter on that motion, to further delay until after Gretter had the opportunity to pursue an appeal.  *Id.* ¶ 4.

### L.  Ruling on Gretter's Bankruptcy Filings

A hearing on Gretter's motion to reconsider and the Trustee's motion to convert to Chapter 7 was held on October 9, 2015.  On the record, the Bankruptcy Court denied Gretter's motion to reconsider.  [Bankr. ECF No. 342 at 83; ECF No. 28-8 at 83; *see also* Bankr. ECF No. 322 (Order pursuant to hearing); ECF No. 7-18 at 130 (Order pursuant to hearing)].  Gretter then stated, "my only basis [for objecting to conversion to Chapter 7] was while the pending of my motion [to reconsider], so . . . now that you've ruled, my objection is moot."  [Bankr. ECF No. 342 at 83; ECF No. 28-7 at 83].  The Bankruptcy Court asked if Gretter was withdrawing his objection to the conversion, and Gretter confirmed that he was.  [Bankr. ECF No. 342 at 83–84; ECF No. 28-7 at 83–84].  The Bankruptcy Court subsequently entered an order granting the Trustee's motion to convert to Chapter 7, noting that the order was "[b]ased upon the statements made on the record and the objection having been withdrawn or deemed moot."  [Bankr. ECF No. 321].

### M.  Appeal to District Court

Gretter appealed the Bankruptcy Court's denial of the Dealerships' Motions to Assume and Assign on October 23, 2015.  [Bankr. ECF No. 329; ECF No. 1].  In his appeal, Gretter asks this Court to authorize the Dealerships to assume the Ford Dealership Agreement and assign it to Edwards.  [ECF No. 2 at 3].  Gretter argues the Bankruptcy Court erroneously concluded (1) the Dealerships were in default of their GM and Ford Dealership Agreements and (2) Edwards did not provide adequate assurance of future performance.  [*See* ECF No. 3 ¶¶ 1, 4 (Statement of Issues on Appeal); ECF No. 35 at 4–7, 20 (Response to Motions to Dismiss Appeal)].

*N.  Motion to Dismiss Appeal*

Edwards responded on January 19, 2016 with a Motion to Dismiss Appeal, which argues Gretter's appeal is moot.  [ECF Nos. 22 (motion); 23 (brief); 24 (exhibits)].  GM joined in Edwards's Motion to Dismiss Appeal. [ECF No. 27]. Gretter responded, [ECF Nos. 31 (initial response); 35 (substitute brief)], and GM and Edwards replied, [ECF Nos. 36 (GM); 39 (Edwards)].[6]

Meanwhile, in the bankruptcy case,[7] on March 1, 2016 the Trustee and GM filed a "stipulated motion" informing the Bankruptcy Court that the Dealership Agreement between GM and the Dealerships was "hereby terminated" and that GM had agreed to turn over the funds it held in the Dealerships' open account.  [Bankr. ECF No. 382 at 1].  The Bankruptcy Court ratified the stipulation between GM and the Trustee.  [Bankr. ECF No. 383].  Ally subsequently contested the stipulation, arguing it had a perfected security interest in the funds held by GM in the Dealerships' open account.  [Bankr. ECF No. 384].  But Ally did not object to the termination of the GM Dealership Agreement.  *Id.* at 2.  Ally asked the Court to vacate its ratification of the stipulation, set a briefing schedule on the stipulation, and hold a hearing on the matter.  The Bankruptcy Court granted Ally's motion for reconsideration on April 13, 2016 and vacated its ratification of the GM/Trustee stipulation.  [Bankr. ECF No. 395].  The Bankruptcy Court did not, however, set a briefing schedule or a hearing date for the GM/Trustee stipulation.  No further action has occurred on this matter.

---

[6] Magistrate Judge Helen C. Adams denied Gretter's request to file a surreply. [ECF Nos. 37 (Gretter request); 38 (denial)].

[7] In deciding whether an appeal is moot, the Court may properly consider events occurring in a bankruptcy case subsequent to the filing of an appeal. *In re Little*, 253 B.R. 427, 429 (B.A.P. 8th Cir. 2000).

Additionally, on March 3, 2016, Edwards filed a motion in the bankruptcy case asking for the return of the $75,000 deposit it had paid in connection with the APA.  [Bankr. ECF No. 387].  There was no timely objection to Edwards's motion, and the Bankruptcy Court granted it on March 15, 2016.  [Bankr. ECF No. 394].

The parties filed joint status reports with this Court on March 30, 2016, [ECF No. 48], and April 29, 2016, [ECF No. 50].  In the April 29 status report, the parties informed the Court that Edwards's $75,000 had been returned.  *Id.* at 1.  The parties represented that GM and the Trustee had "stipulated that the [GM Dealership Agreement] would be terminated upon [the Bankruptcy Court's] approval of the stipulation."  *Id.*  The parties indicated that the stipulation was "thus still pending."  *Id.* at 2.

In light of the April 29 status report, Magistrate Judge Helen C. Adams allowed the parties to file supplemental briefing.  [*See* ECF No. 51].  The parties did so on May 16, 2016.  [ECF Nos. 52 (GM); 53 (Edwards); 54 (Gretter)].

## II.  ANALYSIS

### A.  *Mootness Arguments*

Edwards argues in its Motion to Dismiss Appeal that this Court lacks subject matter jurisdiction because Gretter's appeal is moot.  Edwards contends Gretter's appeal is moot for several reasons: (1) Gretter did not enter an appearance until after the Bankruptcy Court had denied the Motions to Assume and Assign; (2) Gretter did not obtain a stay or bond after the Bankruptcy Court denied the Motions to Assume and Assign; (3) the bankruptcy case was converted to Chapter 7 with no objection from Gretter; and (4) the asset Edwards sought to purchase is gone. [ECF No. 23 at 1].  At bottom, Edwards believes "no meaningful or effective relief could be fashioned even if the appeal would be found meritorious on legal principles."  *Id.* at 5.

Gretter disagrees, asserting that this Court can provide effective relief by reversing the Bankruptcy Court's denial of the Motions to Assume and Assign.  [ECF No. 31 at 2].  Gretter argues that "Edwards's assertion . . . that it will not proceed with closing on the sale of [the Dealerships'] assets pursuant to the [APA] . . . is of no significance with respect to the question of whether this appeal presents a live 'case or controversy.'"  [ECF No. 35 at 1–2].  Acknowledging that Edwards "desire[s] to walk away from" the APA, Edwards contends it is for the Bankruptcy Court to decide if Edwards is entitled to do so; Gretter believes that this Court should decide his appeal on the merits and that, if this Court reverses the Bankruptcy Court's denial of the Motions to Assume and Assign, the case should go back to the Bankruptcy Court so it can "reassess[] the parties' respective rights and obligations under the APA."  *Id.* at 9–10.  Indeed, Gretter avows that this Court would exceed the scope of its authority if it were "to determine Edwards's obligations under the APA, as a matter of first impression."  *Id.* at 8.  Gretter complains, "Edwards is attempting to raise a breach of contract claim for the first time in an appellate proceeding with its 'equitable mootness' argument."  *Id.* at 15.  Gretter insists that the enforceability of the APA should be determined "in a potential breach of contract action upon remand."  *Id.* at 10.

Gretter further contends his appeal is not equitably moot because reversal "would not be detrimental to a party who changed its position in reliance on the [denial of the Motions to Assume and Assign]."  [ECF No. 31 at 3].  In Gretter's view, the Bankruptcy Court "did not grant affirmative relief, upon which third parties have made commitments in reliance thereon."  *Id.* at 14.  Gretter does not see Ally's repossession of vehicles as an impediment to his appeal because Edwards "would be able to start afresh with present model year new vehicles, ordered according to its preferences"—a "windfall," according to Gretter.  *Id.* at 15.  Gretter also alleges Edwards would be able to purchase the dealership real estate from Washington State Bank and Hills

Bank & Trust Company for the amount Edwards agreed to pay in the Second Amended APA. *Id.* at 14. Finally, Gretter believes the conversion to Chapter 7 is of no consequence because the Bankruptcy Court could convert the case back to Chapter 11 or substitute the Chapter 7 Trustee for the Dealerships on the Motions to Assume and Assign. *Id.* at 3.

## B. Equitable Balancing

There are two types of mootness in bankruptcy appeals: constitutional and equitable. *Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002). "The constitutional doctrine of mootness arises from Article III's jurisdictional 'case or controversy' requirement and differs from the doctrine of 'equitable mootness' which relies on a 'pragmatic principle' that with the passage of time after the implementation of a judgment in equity 'effective relief on appeal becomes impractical, imprudent, and therefore inequitable.'" *In re Carr*, 321 B.R. 702, 705 (E.D. Va. 2005). Thus, constitutional mootness denotes "*inability* to alter the outcome," while equitable mootness is merely "*unwillingness* to alter the outcome." *Matter of UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). The Court reads Edwards's Motion to Dismiss Appeal as arguing equitable mootness, and therefore the following analysis focuses on that particular breed.

Equity is necessarily a balancing act, so several factors weigh into the Court's evaluation of equitable mootness:

1. Whether the appellant sought and obtained a stay;

2. if not, then why not;

3. whether the reorganization plan or other equitable relief ordered has been substantially consummated;

4. what kind of transactions have been consummated;

5. the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted;

6. the extent to which the relief requested on appeal would affect the interests of third parties;

7. whether the bankruptcy case has been converted to Chapter 13; and

8. the public policy of affording finality to bankruptcy judgments.

*See In re Williams*, 256 B.R. 885, 897 n.11 (B.A.P. 8th Cir. 2001) (factors 1, 3, 5, 6, and 8); *Mac Panel*, 283 F.3d at 625 (factors 1, 3, 5, and 6); *In re Little*, 253 B.R. 427, 429 (B.A.P. 8th Cir. 2000) (factor 7); *In re Club Associates*, 956 F.2d 1065, 1069 n.11 (11th Cir. 1992) (factors 1 through 7).

Considering these factors, the equitable balance tilts heavily against Gretter. First, he did not object to Ally's repossession of its vehicle collateral, or to Washington State Bank's repossession of the Gretter Autoland, Inc., real estate, or to the return of Edwards's deposit. Second, he conveyed the 214 South Airport Road property to Hills Bank & Trust Company. Third, he withdrew his objection to the Trustee's motion to convert to Chapter 7. *See In re Sasso*, 409 B.R. 251, 254 (B.A.P. 1st Cir. 2009) ("The general rule is that conversion of a bankruptcy petition from one chapter to another moots any appeal taken from an order in the original chapter."). Finally—and most importantly—he did not seek a stay of any of the Bankruptcy Court's rulings. *See United States v. Fitzgerald*, 109 F.3d 1339, 1342 (8th Cir. 1997) (noting the general rule that "a debtor who fails to obtain a stay of [a bankruptcy] sale has no remedy on appeal and the appeal is moot"); *In re Van Iperen*, 819 F.2d 189, 190–91 (8th Cir. 1987) ("To avoid losing their cows and machinery the [debtors] should have moved the district court for a stay pending appeal. They made no such effort, the cows and machinery are gone, and it is too late to get them back."). Absent a stay, Ally and Washington State Bank were entitled to rely on the Bankruptcy Court's approval of their actions and dispose of the repossessed assets however they saw fit; the Trustee was entitled to move forward with Chapter 7 proceedings; and Edwards was entitled to deem the Second Amended APA a nullity. *See In re Info. Dialogues, Inc.*, 662 F.2d 475, 476–77 (8th

-18-

Cir. 1981) ("[T]he mootness doctrine promotes an important policy of bankruptcy law that court-approved reorganizations be able to go forward in reliance on such approval unless a stay has been obtained.").  Gretter has not offered justification for his non-actions.

And despite Gretter's belief that the Court lacks the ability to interpret the Second Amended APA, the Court concludes that the relief Gretter seeks is no longer available.  Gretter wishes to reverse the denial of the Motions to Assume and Assign so that the Dealerships might pursue the sale to Edwards.  But the deal contemplated by the Second Amended APA cannot come to pass due to the developments of the bankruptcy case.  The real estate to be sold to Edwards now belongs to different parties; Ally has repossessed its vehicles; the bankruptcy has been converted to Chapter 7; the Dealerships are no longer "going concerns."[8]  *Cf. Matter of Food Barn Stores, Inc.*, No. 93-0879-CV-W-6, 1994 WL 744523, at \*4 (W.D. Mo. Nov. 18, 1994) (unpublished) (finding appeal moot when debtor's property rights had been terminated and property was relet to a third party).  On top of all this, Edwards's deposit has been returned and termination of the GM Dealership Agreement looms around the corner.  Because of these developments, Edwards no longer seeks to purchase the Dealerships.  In total, the circumstances have changed significantly since the Bankruptcy Court denied the Motions to Assume and Assign.  Even if the Court were to grant Gretter the relief he asks for in his appeal, this would not undo what has transpired since the Bankruptcy Court denied those motions.  Consequently, "common sense and equitable considerations require dismissal of this appeal."  *Matter of Crystal Oil Co.*, 854 F.2d 79, 81 (5th Cir. 1988).

---

[8] "Going concern" is defined as a "commercial enterprise actively engaging in business with the expectation of indefinite continuance." Going Concern, Black's Law Dictionary (10th ed. 2014).

-19-

### *C.  Vacatur*

Anticipating the possibility this Court might deem his appeal moot, Gretter urges the Court to vacate the Bankruptcy Court's denial of the Motions to Assume and Assign and remand with directions to dismiss.  [ECF No. 35 at 14–21].  Gretter desires this tack because it would strip the denial of its binding effect and clear the path for future litigation of the issues between the parties— namely, whether the Bankruptcy Court's denial was based on false testimony.  *Id.* at 20 (alterations and internal quotation marks omitted).

Vacatur is an equitable remedy and an "extraordinary" one at that.  *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) (further describing vacatur as appropriate in "exceptional circumstances").  It is Gretter's burden to show his entitlement to that remedy.  *Cmty. Stabilization Project v. Martinez*, 31 F. App'x 340, 342 (8th Cir. 2002).  Relative fault and public interest are the two primary factors to consider in assessing vacatur requests.  *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 118 (4th Cir. 2000) (citing *Bancorp*).  Vacatur is appropriately ordered when appellate review is "prevented through happenstance—that is to say, where a controversy presented for review has become moot due to circumstances unattributable to any of the parties."  *Bancorp*, 513 U.S. at 23 (internal quotation marks omitted).

Again, the equities are against Gretter because he failed to preserve the status quo pending appeal and has not otherwise shown the public interest would be served by vacatur.  *See Martinez*, 31 F. App'x at 342 (holding vacatur was not warranted when appellant did not seek a stay despite knowing the action it challenged "would proceed unless it obtained a stay or an injunction").  Gretter thus has failed to carry his burden to establish this case presents exceptional circumstances justifying vacatur. The Court denies his request.

### III.  CONCLUSION

The Motion to Dismiss Appeal filed by Edwards Auto Plaza, Inc., [ECF No. 22], is GRANTED.  The appeal filed by James M. Gretter, [ECF No. 1], is DISMISSED as equitably moot.

IT IS SO ORDERED.

Dated this 15th day of July, 2016.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT